FUENTES,
joined by RESTREPO, Circuit Judges, dissenting:
In November 2011, the question of whether to allow sports betting in New Jersey went before the electorate. By a 2-1 margin, New Jersey voters passed a referendum to amend the New Jersey Constitution to allow the New Jersey Legislature *403 to “authorize by law” sports betting.[1] Accordingly, the Legislature enacted the 2012 Sports Wagering Act (“2012 Law”). The Sports Leagues challenged this Law, claiming that it violated the Professional and Amateur Sports Protection Act’s (“PASPA”) prohibition on states “authorizing] by law” sports betting.[2] In Christie I, we agreed with the Sports Leagues and held that the 2012 Law violated and thus was preempted by PASPA. We explained, however, that New Jersey was free to repeal the sports betting prohibitions it already had in place. We rejected the argument that a repeal of prohibitions on sports betting was equivalent to authorizing by law sports betting. When the matter was brought to the Supreme Court, the Solicitor General echoed that same sentiment, stating that, “PASPA does not even obligate New Jersey to leave in place the state-law prohibitions against sports gambling that it had chosen to adopt prior to PASPA’s enactment. To the contrary, New Jersey is free to repeal those prohibitions in whole or in part.”[3]
So New Jersey did just that. In 2014, the New Jersey Legislature repealed certain sports betting prohibitions at casinos and gambling houses in Atlantic City and at horse racetracks" in the State (“2014 Repeal”). In addition to repealing the 2012 Law in full, the 2014 Repeal stripped New Jersey of any involvement in sports betting, regulatory or otherwise. In essence, the 2014 Repeal rendered previous prohibitions on sports betting non-existent.
But the majority today concludes that the New Jersey Legislature’s efforts to satisfy its constituents while adhering to our decision in Christie I are still in violation of PASPA. According to the majority, the “selective” nature of the 2014 Repeal amounts to “authorizing by law” a sports wagering scheme. That is, because the State retained certain restrictions on sports betting, the majority infers the authorization by law. I cannot agree with this interpretation of PASPA.
PASPA restricts the states in six ways— a state cannot “sponsor, operate, advertise, promote, license, or authorize by law or compact” sports betting.[4] The only one of these six restrictions that includes “by law” is “authorize.” None of the other restrictions say anything about how the states are restricted. Thus, I believe that Congress gave this restriction a special meaning — that a state’s “authorization] by law” of sports betting cannot merely be inferred, but rather requires a specific legislative enactment that affirmatively allows the people of the state to bet on sports. Any other interpretation would be reading the phrase “by law” out of the statute.
Indeed, we stated exactly this in Christie I — that all PASPA prohibits is “the affirmative ‘authoriz[ation] by law’ of gambling schemes.”[5] Thus, we explained, nothing prevented New Jersey from repealing its sports betting prohibitions, since, “in reality, the lack of an affirmative prohibition of an activity does not mean it is affirmatively authorized by law.”[6] As we noted, “that the Legislature needed to enact the [2012 Law] itself belies any contention that the mere repeal of New Jersey’s ban on sports gambling was sufficient to *404 ‘authorize [it] by law.’ ”[7] The Legislature itself “saw a meaningful distinction between repealing the ban on sports wagering and authorizing it by law, undermining any contention that the amendment alone was sufficient to affirmatively authorize sports wagering — the [2012 Law] was required.”[8] In short, we explained that there was a false equivalence between repeal and authorization.
With the 2014 Repeal, the New Jersey Legislature did what it thought it was permitted to do under our reading of PAS-PA in Christie I. The majority, however, maintains that the 2014 Repeal “authorizes” sports wagering at casinos, gambling houses, and horse racetracks simply because other sports betting prohibitions remain in place.[9] According to the majority, “[a]bsent the 2014 Law, New Jersey’s myriad laws prohibiting sports gambling would apply to the casinos and racetracks,” and thus “the 2014 Law provides the authorization for conduct that is other-, wise clearly and completely legally prohibited.”[10] But I believe the majority is mistaken as to the impact of a partial repeal.
A repeal is defined as an “abrogation of an existing law by legislative act.”[11] When a statute is repealed, “the repealed statute, in regard to its operative effect, is considered as if it had never existed.”[12] If a repealed statute is treated as if it never existed, a partially repealed statute is treated as if the repealed sections never existed.[13] The 2014 Repeal, then, simply returns New Jersey to the state it was in before it first enacted those prohibitions on sports gambling. In other words, after the repeal, it is as if New Jersey never prohibited sports wagering at casinos, gambling houses, and horse racetracks. Therefore, with respect to those locations, there are no laws governing sports wagering. Contrary to the majority’s position, the permission to engage in such an activity is not affirmatively granted by virtue of it being prohibited elsewhere.
To bolster its position, the majority rejects our reasoning in Christie I, stating that “[t]o the extent that in Christie I we took the position that a repeal cannot constitute an authorization, we now reject that reasoning.”[14] I continue to maintain, however, that the 2014 Repeal is not an affirmative authorization by law. It is merely a repeal — it does not, and cannot, authorize by law anything.
*405 In my view, the majority’s position that the 2014 Repeal “selectively grants permission to certain entities to engage in sports gambling”[15] is simply incorrect. There is no explicit grant of permission in the 2014 Repeal for any person or entity to engage in sports gambling. Rather, the 2014 Repeal is a self-executing deregula-tory measure that repeals existing prohibitions and regulations for sports betting and requires the State to abdicate any control or involvement in sports betting.[16] The majority fails to explain why a partial repeal is equivalent to a grant of permission (by law) to engage in sports betting.
Suppose the State did exactly what the majority suggests it could have done: repeal completely its sports betting- prohibitions. In that circumstance, sports betting could occur anywhere in the State and there would be no restrictions as to age, location, or whether a bettor could wager on games involving local teams. Would the State violate PASPA if it later enacted limited restrictions regarding age requirements and places where wagering could occur? Surely no conceivable reading of PASPA would preclude a state from restricting sports wagering in this scenario. Yet the 2014 Repeal comes to the same result.
The majority also fails to illustrate how the 2014 Repeal results in sports wagering 'pursuant to state law when there is effectively no law in place as to several locations, no scheme created, and no state involvement. A careful comparison with the 2012 Law is instructive. The 2012 Law lifted New Jersey’s ban on sports wagering and created a licensing scheme for sports wagering pools at casinos and racetracks in the State. This comprehensive regime required close State supervision and regulation of those sports wagering pools. For instance, the 2012 Law required any entity that wished to operate a “sports pool lounge” to acquire a “sports pool license.” To do so, a prospective operator was required to pay a $50,000 application fee, secure Division of Gaming Enforcement (“DGE”) approval of all internal controls, and ensure that any of its employees who were to be directly involved in sports wagering obtained individual licenses from the DGE and the Casino Control Commission (“CCC”). In addition, the betting regime required entities to, among other things, submit extensive documentation to the DGE, adopt new “house” rules subject to DGE approval, and conform, to DGE standards. This, of course, violated PASPA in the most basic way: New Jersey developed an intricate scheme that both “authorize[d] by law” and “license[d]” sports gambling. The 2014 Repeal eliminated this entire scheme. Moreover, all state agencies with jurisdiction over state casinos and racetracks, such as the DGE and the CCC, were stripped of any sports betting oversight.
The majority likewise falters when it analogizes the 2014 Repeal to the exception Congress originally offered to New Jersey in 1992. The exception stated that PASPA did not apply to “a betting, gambling, or wagering scheme ... conducted exclusively in casinos[,] ... but only to the extent that ... any commercial casino gaming scheme was in operation ... throughout the 10-year period” before PASPA was enacted.[17] Setting aside the most obvious distinction between the 2014 *406 Repeal and the 1992 exception — that it contemplated a scheme that the 2014 Repeal does not authorize — the majority misses the mark when it states: “If Congress had not perceived that sports gambling in New Jersey’s casinos would violate PASPA, then it would not have needed to insert the New Jersey exception.”[18] Congress did not, however, perceive, or intend for, private sports wagering in casinos to violate PASPA. Instead, Congress prohibited sports wagering undertaken pursuant to state law. That the 2014 Repeal might bring about an increase in the amount of private, legal sports wagering in New Jersey is of no moment, and the majority’s reliance on such a possibility is misplaced. The majority is also wrong in a more fundamental way. The exception Congress offered to New Jersey was exactly that: an exception to the ordinary prohibitions of PASPA. That is to say, with this exception, New Jersey could have “sponsor[ed], operated, advertised, promoted, licensed, or authorized by law or compact” sports wagering. Under the 2014 Repeal, of course, New Jersey cannot and does not aim to do any of these things.
Because I do not see how a partial repeal of prohibitions is tantamount to authorizing by law a sports wagering scheme in violation of PASPA, I respectfully dissent.

. N.J. Const, art. IV, § 7, ¶ 2(D).

. See 28 U.S.C. §3702(1).

. Br. for the United States in Opp’n at 11, Christie v. Nat'l Collegiate Athletic Ass’n, Nos. 13-967, 13-979, and 13-980 (U.S. May 14, 2014).

. 28 U.S.C. § 3702(1) (emphasis added).

. Christie I, 730 F.3d at 232 (alteration in original).

. Id.

. Id. (alteration in original).

. Id.

. I refer to the repeal of prohibitions as applying to casinos, gambling houses, and horse racetracks, with the understanding that the repeal applies to casinos and gambling houses in Atlantic City and horse racetracks in New Jersey for those over 21 not betting on New Jersey collegiate teams or any collegiate competition occurring in New Jersey.

. Maj. Op. 396.

. Black's Law Dictionary 1325 (8th ed. 2007).

. 73 Am. Jur. 2d Statutes § 264.

. See, e.g., Ex parte McCardle, 74 U.S. 506, 514, 7 Wall. 506, 19 L.Ed. 264 (1868) ('‘[W]hen an act of the legislature is repealed, it must be considered ... as if it never existed.”); Anderson v. USAir, Inc., 818 F.2d 49, 55 (D.C. Cir. 1987) ("Common sense dictates that repeal means a deletion. This court would engage in pure speculation were it to hold otherwise.”); Kemp by Wright v. State, Cty. of Burlington, 147 N.J. 294, 687 A.2d 715, 723 (1997) ("In this State it is the general rule that where a statute is repealed and there is no saving[s] clause or a general statute limiting the effect of the repeal, the repealed statute, in regard to its operative effect, is considered as though it had never existed, except as to matters and transactions passed and closed.”).

. Maj. Op. 396-97.

. Id.

. For example, under the 2014 Repeal, "[the Division of Gaming Enforcement ("DGE”) ] now considers sports wagering to be 'non-gambling activity’ ... that is beyond DGE’s control and outside of DGE’s regulatory authority.” App. 416.

. 28 U.S.C. § 3704(a)(3)(B).

. Maj. Op. 397.